Victoria L. Weatherford (SBN 267499)
vweatherford@bakerlaw.com
**BAKER & HOSTETLER LLP**
Transamerica Pyramid
600 Montgomery Street, Suite 3100
San Francisco, CA 94111
Telephone:    415.659.2600
Facsimile:    415.659.2601

Matt Schock (*Pro Hac Vice Forthcoming*)
mschock@bakerlaw.com
**BAKER & HOSTETLER LLP**
1801 California Street, Suite 4400
Denver, CO 80202
Telephone:    303.861.0600
Facsimile:    303.861.7805

*Attorneys for Plaintiff*
*PENTEC HEALTH, INC.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | |
|---|---|
| PENTEC HEALTH, INC.,<br><br>             Plaintiff,<br><br>      vs.<br><br>DAVITA INC.<br><br>             Defendant. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1) **VIOLATION OF CAL. BUS. & PROF. CODE § 17200;**<br><br>2) **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; AND**<br><br>3) **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I. INTRODUCTION.................................................................................................. 1

II. PARTIES ............................................................................................................ 2

III. JURISDICTION AND VENUE ......................................................................... 2

IV. DIVISIONAL ASSIGNMENT .......................................................................... 3

V. FACTUAL BACKGROUND............................................................................... 3

    A.    Intravenous and Intraperitoneal Nutrition Therapies........................................ 3

    B.    Pentec .............................................................................................................. 4

    C.    DaVita.............................................................................................................. 4

    D.    DaVita's Abrupt Policy Change ....................................................................... 5

    E.    Pentec's Concerns About DaVita's Policy Change........................................... 7

    F.    DaVita Implements Its New Policy .................................................................. 9

    G.    DaVita's Policy Harms Pentec and Patients .................................................. 11

VI. CAUSES OF ACTION ..................................................................................... 13

VII. PRAYER FOR RELIEF .................................................................................. 15

VIII. JURY DEMAND ........................................................................................... 16

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

Plaintiff PENTEC HEALTH, INC. ("Pentec" or "Plaintiff") brings this action, by and through its attorneys, for injunctive relief and damages against Defendant DAVITA INC. ("DaVita" or "Defendant"). PLAINTIFF hereby complains of the DEFENDANT as follows:

## I.    INTRODUCTION

1.    Pentec provides life-sustaining intravenous and intraperitoneal ("IV/IP") nutrition therapies to dialysis patients across the country, including those served by DaVita, one of the country's largest (if not the largest) dialysis providers. The dialysis patients Pentec serves are highly vulnerable; their kidneys have failed and they cannot maintain adequate nutrition by eating or tube-feeding. Accordingly, the nutrition therapies Pentec provides literally sustain these patients as they attempt to improve their condition and await a kidney transplant.

2.    Pentec has been forced to bring this Complaint because although DaVita facilitated—and even recommended—IV/IP therapies at its clinics for years, DaVita has turned corporate policy on its head and unilaterally decided to discontinue, as soon as possible, as many patients from IV/IP therapy as possible, and implement new purported "eligibility" criteria that would make it all but impossible for patients to continue receiving those therapies at DaVita clinics. In a matter of days, DaVita has discontinued IV/IP therapies for hundreds of patients, not only putting them in what Pentec believes to be grave danger but also imperiling Pentec's ability to continue providing nutrition therapies for some of the most vulnerable individuals in the country.

3.    DaVita's policy also makes it extremely difficult for patients to obtain IV/IP nutrition therapies. DaVita has done this by imposing what its own dietitians have referred to as "very, very, very strict" clinical criteria that are "incredibly difficult to meet for most" patients, ultimately making the IV/IP therapies "less accessible as an intervention for [DaVita] patients."

4.    Even patients that meet DaVita's unilaterally imposed criteria cannot obtain IV/IP nutrition therapies unless they are independently approved by DaVita's Clinical Pharmacy Management Team.

5.    Thus, even if a patient's dietitian, physician, and insurer all agreed that a patient should receive IV/IP nutrition therapy, DaVita's policy effectively prevents that patient from obtaining it—that is, unless the patient meets onerous clinical criteria and receives approval from DaVita.

6. DaVita's corporate policy of (1) unilaterally discontinuing treatment and (2) making it functionally impossible to obtain, unlawfully invades the relationships between thousands of patients and their doctors, dietitians, and pharmacists. In doing so, it also puts Pentec's business and its ability to serve patients at risk.

7. In order to prevent significant potential harm to patients and Pentec, DaVita's disastrous policy must be stopped. If it is not, patients could suffer grievous injury, up to and including death, and Pentec could functionally be forced out of business, with its ability to continue providing life-sustaining therapies eliminated by DaVita's unlawful conduct.

## II.    PARTIES

8. Plaintiff Pentec Health, Inc. is a U.S. corporation organized under the laws of Pennsylvania with its principal place of business in Pennsylvania.

9. Pentec Health, Inc. is a provider of IDPN and IPN therapies to patients receiving care for dialysis in this District and across the United States.

10. Defendant DaVita Inc. is a U.S. corporation organized under the laws of Delaware with its principal place of business in Colorado.

11. DaVita Inc. is one of the largest providers of dialysis services in the United States, which it provides in this District and across the country.

## III.    JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendant, and the amount in controversy exceeds $75,000. Diversity of citizenship exists because the Plaintiff is a citizen of Pennsylvania and the Defendant is a citizen of Delaware and Colorado.

13. Personal jurisdiction over the Defendant is proper. The Defendant has conducted business within the State of California and this District, and it has engaged in conduct within this District causing the harm alleged herein.

14. Pursuant to 28 U.S.C. § 1391, venue properly lies in this District because a substantial part of the events giving rise to the claims herein occurred in this District. In fact, a significant number of patients served by IDPN and IPN therapies are located within the State of California and this District.

- 2 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**IV.    DIVISIONAL ASSIGNMENT**

15.    DaVita maintains dialysis locations in all three Divisions of this District; accordingly, any Division is the appropriate location for assignment of this Action.

**V.    FACTUAL BACKGROUND**

   **A.    Intravenous and Intraperitoneal Nutrition Therapies**

16.    IV/IP nutrition therapies provide sustenance to patients that cannot maintain adequate nutrition orally (by eating) or enterally (through tube feeding).  These therapies are used chiefly with patients experiencing end stage renal disease ("ESRD") that are receiving dialysis, which can itself inhibit patients' ability to maintain baseline nutrition.

17.    There are two critical nutrition therapies at issue in this case: intradialytic parenteral nutrition ("IDPN") and intraperitoneal nutrition ("IPN").  IDPN infuses nutrients directly into the bloodstream using a dialyzer, while IPN delivers amino acids directly into the peritoneal cavity (abdomen) via a dialysis catheter using a dialysate solution.

18.    IDPN and IPN are specialized and sterilely compounded drug therapies. They reduce patient morbidity and mortality and improve nutrition and quality of life by staving off "protein-energy wasting"—*i.e.*, the loss of body mass.

19.    Although a relatively small subset of patients are prescribed IDPN or IPN—around 1-2% of all dialysis patients—these treatments are crucial as part of their ESRD care because they supplement the nutrients that the patient is unable to get through their oral or enteral diets. Patients undergoing dialysis for ESRD require increased protein due to the disease state and dialysis process.

20.    IDPN and IPN are widely recognized by the medical community as essential components of ESRD care when appropriately ordered by a treating physician.  In fact, IDPN and IPN were originally developed specifically to provide nutrition to supplement or support the oral and enteral diets of dialysis patients suffering from malnutrition.

21.    Many public and commercial health insurance payers, including Medicare, expressly cover and pay for IDPN and IPN.

22.    IDPN and IPN are administered to patients through the same medical devices used to administer dialysis.  Patients cannot receive IDPN or IPN unless they are also receiving dialysis.

- 3 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23.    IDPN and IPN therapies are consistent with improved patient outcomes.

**B.    Pentec**

24.    Pentec is a nationwide specialty pharmacy that handles, compounds, and dispenses high-complexity medications that treat complicated or rare health conditions. For decades, Pentec has compounded multiple medications, including IDPN and IPN nutritional therapies, which are used for patients undergoing dialysis. When the patient's treating physician determines that IDPN or IPN is an appropriate treatment, the physician writes a prescription, which Pentec then fills and sends for administration to the patient.

25.    Many of the patients to which Pentec provides IDPN and IPN also receive dialysis at DaVita clinics.

26.    Pentec has agreements with many insurance carriers that, among other things, facilitate reimbursement for the provision of IDPN and IPN to patients that receive prescriptions for those treatments.   As noted above, health insurers generally cover IDPN and IPN so long as they are appropriately prescribed by a treating physician.

27.    Pentec does not supply IDPN and IPN to DaVita or any other dialysis provider; it is not a vendor.   Rather, it is a specialty pharmacy provider that compounds and provides IDPN and IPN directly to patients and is reimbursed by patients' insurance carriers directly, exactly like a traditional pharmacy.   Pentec has provider relationships with the patients it serves that are independent of those patients' relationships with their dialysis providers.

28.    Historically, approximately two thirds of the IDPN and IPN patients Pentec serves receive dialysis treatment through DaVita.

29.    IDPN and IPN are core businesses for Pentec.   Approximately one-third of Pentec's annual year-to-year revenue is attributable to IDPN and IPN provided to patients receiving dialysis through DaVita.

**C.    DaVita**

30.    DaVita is one of the largest (if not the largest) dialysis providers in the United States.   It owns and manages thousands of outpatient dialysis facilities throughout the country and dozens within this District.

COMPLAINT

31. In the typical case, if a DaVita dietitian sees a patient who has low nutritional levels and meets other treatment thresholds, that dietitian will send a referral to Pentec for further nutritional support and, potentially, IDPN or IPN therapy. The Pentec pharmacist and clinical team then review the patient's clinical data and creates a patient-specific order for the patient's treating physician to review and approve. If the physician agrees, he or she will prescribe the recommended nutritional therapy, at which point Pentec compounds the medication, and ships it to DaVita.

32. Where IDPN or IPN has been prescribed by a patient's doctor, DaVita's primary role with respect to IDPN and IPN is simply to oversee administration of the treatments that the doctor has directed to be ordered and the Pentec pharmacist has compounded and supplied. It does not have a substantive role in the prescription or provision of those treatments.

33. In fact, the administration of IDPN and IPN involves DaVita mainly because the treatments must be provided using dialysis equipment. Most other alternative nutrition treatments—for example, tube feeding—do not require dialysis equipment or otherwise involve DaVita.

34. Despite this limited administrative role, DaVita has attempted to wrest control of IDPN and IPN recommendation and prescription away from dietitians and doctors by creating its own opaque corporate approval structure for those treatments, and in the process, has harmed patients and Pentec.

**D.    DaVita's Abrupt Policy Change**

35. On March 11, 2026, DaVita informed Pentec and other IDPN and IPN providers, with no prior communication or discussion, that it had decided unilaterally to discontinue IDPN and IPN treatments for a substantial number of patients. This decision put those patients at risk and left them unsure of where to turn for the life-sustaining therapies they had been receiving.

36. Specifically, DaVita stated that it had "shifted IDPN/IPN to nonformulary status in February, which means the therapy will be reviewed and transitioned for new and existing patients according to internal approval pathways." DaVita did not explain what "nonformulary" meant, but generally something that is "nonformulary" is not supported or offered absent special circumstances.

37. Since DaVita's initial policy change announcement, Pentec has learned that DaVita will no longer accept prescribed IDPN and IPN therapies as a matter of course.

38. Instead, DaVita has implemented an onerous three-pronged "approval pathway" for

- 5 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

IDPN and IPN.

39.     First, it has forced dietitians serving patients in its dialysis centers to ensure that IDPN and IPN patients meet "very, very, very strict" internal DaVita clinical criteria before even recommending to the patients' treating physicians that those patients receive IDPN or IPN therapy. Upon information and belief, these criteria exceed even the medical necessity requirements imposed by Medicare or commercial insurance companies, and serve as a mechanism to prevent dietitians from recommending IDPN or IPN in all but the most extreme malnutrition cases.

40.     Second, if DaVita's unilaterally imposed criteria are not met, prescribing physicians must pursue a separate, DaVita-run appeal process for each and every patient before DaVita will permit IDPN or IPN to be provided to that patient.

41.     Third, on information and belief, DaVita subjects each and every physician prescription and/or dietitian recommendation of IDPN or IPN to independent review by its Clinical Pharmacy Management Team.  Nothing about that standard of that review has been explained or revealed to Pentec.

42.     Additionally, DaVita has told Pentec that it was removing, and on information and belief it has removed, all educational and background materials on IDPN and IPN from its internal web portal—the same materials that, up until March 2026, recommended IDPN and IPN treatments as medically necessary and appropriate for certain patients—thus eliminating crucial reference points for dietitians with patients that could benefit from those treatments.

43.     DaVita also demanded that Pentec and other IDPN/IPN providers "cease the promotion, marketing, distribution, recommendation, or facilitation of . . . IDPN/IPN . . . in DaVita facilities" and asserted that Pentec—which DaVita characterized as a "vendor"—was "not permitted to directly contact [DaVita's] clinicians, staff, or facilities."

44.     In other words, DaVita not only embargoed IDPN and IPN treatments, but attempted to eliminate any information about their existence, as well.

45.     Lastly, DaVita gave Pentec and other IDPN/IPN providers an ultimatum: become a contracted DaVita vendor or be blocked from providing IDPN and IPN to current and future patients receiving dialysis through DaVita.  Although the scope and purpose of such a proposed vendor

- 6 -

COMPLAINT

relationship is unclear—DaVita does not purchase IDPN or IPN—DaVita made clear it was not interested in negotiating; it told Pentec that "an executed contract will be required in advance of initiating IDPN/IPN therapy for new and former patients moving forward."

### E.    Pentec's Concerns About DaVita's Policy Change

46.    Pentec had several immediate and serious concerns with DaVita's policy change. First, Pentec did not understand why DaVita moved away from established and accepted practices for IDPN and IPN.  For years preceding DaVita's March 11, 2026 communication, DaVita had an established and long-standing policy in place regarding the recommendation of IDPN and IPN services that, on information and belief, was consistent with established medical practice and insurance coverage criteria and did not impose additional unilateral approval criteria on patients.  Pentec partnered with DaVita for decades with this policy in place.

47.    As noted above, DaVita does not prescribe, produce, or pay for IDPN or IPN, and its role in administering them is minimal. The March 2026 policy announcement thus not only dramatically exceeded DaVita's historical role in the recommendation of IDPN or IPN services, but also purported to establish strict new criteria to obtain them as well—criteria that DaVita's own dietitians believed were "incredibly difficult to meet for most" of their patients.

48.    Nor does DaVita have any role in assessing the safety and efficacy of IDPN or IPN. DaVita is not a regulatory agency or a standard setting body.  The safety and efficacy of IDPN and IPN are well-accepted in the medical community as evidenced by decades of established utilization across the United States and through official practice guidelines such as the National Kidney Foundation's Kidney Disease Outcomes Quality Initiative (KDOQI) 2020 and 2000.  Additionally, IDPN and IPN administration is already subject to robust regulatory standards, as is true of all prescription-only medication therapies in the United States.

49.    Although DaVita has traditionally acknowledged that KDOQI Guidelines support the provision of IDPN and IPN, DaVita's claim that its new policy is based on "an internal review that yielded opportunities for criteria alignment against the KDOQI 2020 Guidelines" was cause for concern for Pentec.  In the six years since the publication of those Guidelines, DaVita had never before

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

mentioned to Pentec the need for purported "criteria alignment" or the notion that the Guidelines did *not* support the provision of IDPN and IPN.

50.     Indeed, while the KDOQI 2020 Guidelines are intended to provide evidence-based recommendations for chronic kidney disease management, they do not contain anything to suggest any change in the safety or efficacy of IDPN and IPN.

51.     DaVita also stated in support of its policy change that it had located studies showing "no demonstrated benefit in hard outcomes" from IDPN and IPN.  But the 2020 KDOQI Guidelines on which DaVita purportedly relied *did* assess prior studies and continued to recommend IDPN/IPN therapies in appropriate cases.

52.     Similarly, DaVita asserted that its policy change was supported by the observation that "Oral Nutrition Supplements (ONS) are often equal or superior with lower risk" than IDPN or IPN, but ignored that IDPN and IPN are only appropriate where ONS has already failed.  It makes no sense to compare them directly.

53.     Pentec was also concerned that DaVita's new policy was significantly out of step with insurance coverage for IDPN and IPN.  Both public and private insurance payers have covered IDPN and IPN for many years and, on information and belief, do not require anything close to the new approval criteria that DaVita's policy unilaterally imposes.  Thus, DaVita's policy created substantial risk that, although a patient could receive a dietitian's recommendation and a doctor's prescription for an insurance-covered therapy, DaVita would nevertheless refuse to allow that therapy to be ordered and administered at its facilities.

54.     Pentec was further concerned that, although DaVita has attempted to formulate a rationale for its new policy, DaVita generally does not and cannot restrict the recommendation, prescription, or provision of nutritional therapies or interventions to ESRD patients, because DaVita is not a medical professional charged with prescribing treatment or an insurance payer that controls payment to Pentec for the treatments it provides.

55.     Put differently, DaVita could not restrict a physician's ability to prescribe or a patient's ability to obtain nutrition by any other route, be it oral, enteral, or parenteral nutrition through a central line.  If, for example, a treating physician ordered tube feeding for a dialysis patient, DaVita would have

- 8 -

no way of stopping the provision of tube feeding equipment or nutritional formula for the patient. DaVita has no role in these aspects of ESRD care.

56.     However, because IDPN and IPN are delivered to patients using dialysis equipment, which DaVita provides, on information and belief, DaVita has seized on that technicality and has used it to create an embargo between Pentec and the patients it serves.

57.     Upon receiving DaVita's March 11 email, Pentec's CEO responded immediately, noting that DaVita's new policy had been provided without advance notice and with limited explanation of what the policy entailed.  Pentec expressed significant concerns about how the policy would impact patient care and requested a meeting with DaVita to address those concerns.  DaVita never responded to that outreach.

**F.       DaVita Implements Its New Policy**

58.     Following DaVita's announcement of its new policy, Pentec's clinical team learned from DaVita field representatives that DaVita was moving forward with its policy in ways that confirmed Pentec's concerns and would be potentially devastating to the patients Pentec serves and to the viability of Pentec's business.

59.     According to its own documents, DaVita originally planned to direct its personnel to "**discontinue**" IDPN and IPN "**as soon as possible**," beginning March 23, 2026.

60.     DaVita stated that it was "**high priority**" to discontinue IDPN and IPN for Integrated Kidney Care ("IKC") patients by March 31, 2026.

61.     DaVita IKC is the brand name for a DaVita service centered around "value-based kidney care arrangements" and includes "shared savings" payment models.  In other words, if DaVita reduces costs for an IKC patient to that patient's insurer, DaVita may have an opportunity to realize additional revenue, regardless of how cost reduction actually affects the patient's well-being.

62.     DaVita stated internally that all non-IKC patients should then be discontinued from IDPN and IPN therapy by the end of April 2026.

63.     By mid-March, 2026, DaVita has already set its new policy in motion, harming patients in the process.  For example, on March 17, 2026, an IPN patient's wife contacted Pentec because she

was told that her husband's IPN treatment would be discontinued. She disagreed with that decision and wanted to know where her husband could continue to get IPN after DaVita unilaterally discontinued it.

64. The same day, Pentec communicated its concern to DaVita that several discontinuation "requests" recently received by DaVita were not properly supported and were unusual given the patient's existing prescription. Pentec asked DaVita to provide (1) a copy of the prescriber's discontinuation order which includes the medical rationale for the discontinued therapy, and (2) documentation that the patient has consented for their IDPN/IPN therapy to be discontinued. In response, one DaVita dietitian explained, "OK, I can try to obtain consents/order but **I am discontinuing it b/c Davita made a new policy that it has to be done**. In other words, seems like MD [the patient's doctor] and/or pt [the patient] **has no choice right now**."

65. DaVita continued to send to Pentec additional discontinuation "requests" which neither referenced nor attached the treating physician's order or clinical criteria for the decision. For example, on March 18, 2026, DaVita personnel told Pentec that they "have orders to discontinue IDPN therapy on 3/23/26" and to "cancel any pending shipments." Pentec again asked for documentation of the prescriber's discontinuation order and the patient's consent. DaVita dietitians refused, citing directives from "upper leadership."

66. On March 19, 2026, a DaVita dietitian told Pentec they had received instructions to cancel another patient's IDPN order. The DaVita dietitian commented, "**I don't think the patient should be stopped, but it wasn't up to me**."

67. After repeated outreach, on March 18, 2026, DaVita agreed to temporarily pause its campaign to discontinue IDPN and IPN treatment for current patients.

68. Pentec continued to seek to engage with DaVita in an effort to understand its corporate policy change with respect to IDPN and IPN. DaVita refused to provide any substantive information.

69. Instead, DaVita has since opted to move ahead with its policy and has continued to stop IDPN and IPN treatment for hundreds of patients. Indeed, after only a few days of implementing its policy, DaVita has discontinued more than 285 IDPN and IPN patients from therapy.

70. DaVita has also significantly restricted access to IDPN and IPN for patients who were not previously prescribed those therapies, which, on information and belief, resulted in the substitution

- 10 -

of DaVita's corporate guidance for the professional judgment of physicians and dietitians. On April 23, 2026, a DaVita dietitian serving patients here in the Bay Area wrote in yet another discontinuation notice, "[i]t is definitely frustration and a sad thing to hear that [IDPN] will become less accessible as an intervention for our patients."

71. DaVita has persisted in discontinuing IDPN and IPN treatment for patients at an alarming rate. On April 24, 2026, for example, Pentec received a single discontinuation notice for ten patients.

72. Pentec, through its counsel, repeatedly reached out to DaVita, requesting additional information on the policy change and seeking to understand why DaVita was removing patients from treatment pursuant to a corporate policy and, according to its own dietitians, giving patients and their treating physicians "no choice" in the matter.

73. Pentec also repeatedly sought to meet with DaVita directly in an effort to continue their long-standing relationship.

74. Additionally, Pentec continued to seek to confirm that the hundreds of treatment discontinuations it was seeing were in fact physician-ordered and consented to by patients.

75. DaVita provided no information in response. Instead, it reiterated its insistence that Pentec cease communication with DaVita personnel and accused Pentec of seeking protected patient information (for the patients *Pentec served*) that DaVita said it could not provide.

76. Meanwhile, DaVita has pushed forward in its efforts to discontinue current treatment for IDPN and IPN patients by, on information and belief, forcing DaVita dietitians to "reevaluate" those patients under DaVita's own unilaterally imposed "incredibly difficult to meet" criteria and then cancel treatment when the patient ultimately does not measure up.

**G.    DaVita's Policy Harms Pentec and Patients**

77. DaVita's corporate policy has resulted in the mass discontinuation of IDPN and IPN for hundreds of vulnerable ESRD patients.

78. This action harms patients by cutting off access to a widely accepted life sustaining treatment, mid-course, based on a corporate policy that purports to impose qualification criteria that the

vast majority of patients previously approved for IDPN or IPN cannot meet, thereby overriding the professional judgment of dietitians and physicians.

79. DaVita has unilaterally forced these criteria on DaVita dietitians, giving them no choice but to cancel treatment immediately, and, on information and belief, without prior approval from the patient or their treating physician in some instances.

80. DaVita's implementation of its policy thus cuts off patients from their treatment and cuts off treatment providers—including Pentec—from their patients.

81. Additionally, DaVita's corporate embargo on IDPN and IPN cuts off future patients from treatment they would otherwise be able to obtain and eliminates even the possibility of Pentec serving as a provider for those patients.

82. Pentec relies on the ability to serve patients that are appropriately prescribed IDPN and IPN in order to continue to operate for future patients that are appropriately prescribed IDPN and IPN.

83. DaVita's policy thus also endangers Pentec's business, which puts IDPN and IPN patients at further risk. Pentec is one of only a few major providers of IDPN and IPN in the United States. On information and belief, another provider or group of providers could not serve all of the patients Pentec serves if Pentec ceased to be able to provide treatment.

84. Nor could a new provider enter the market to serve these patients in a timely manner; providing IDPN and IPN requires licensure as a compounding pharmacy under Section 503(A) of the Food, Drug, and Cosmetic Act, state-by-state accreditation, and reimbursement agreements with health insurance payers, all of which require time and investment to obtain.

85. DaVita's actions, if permitted to continue, would translate to a loss of up to one third of Pentec's annual revenue. Financial harm of this magnitude would render Pentec insolvent. And it would necessarily result in a massive reduction in Pentec's ability to serve patients and risk closure of a core business line, potentially in a matter of months.

86. DaVita's actions also needlessly expose Pentec to potential liability from patients, particularly those who may experience harm from discontinued treatment.

87. Additionally, DaVita's actions harm the goodwill and reputation that Pentec has worked for years to build with the patient community it serves.

88. Pentec repeatedly sought to address DaVita's actions through direct communications with DaVita, but DaVita refused to engage in a business discussion. Left with no choice, Pentec seeks immediate injunctive relief to stop DaVita's harmful practices, which continue to injure patients and Pentec with each passing day, and restitution and damages for harm already suffered by Pentec.

## VI. CAUSES OF ACTION

### COUNT I

**(Unfair Competition in Violation of
Business and Professions Code section 17200, *et seq*.)**

89. Pentec incorporates the allegations in paragraphs 1 through 88 above.

90. California Business and Professions Code section 17200, et seq. (the "UCL") prohibits any unlawful, unfair or fraudulent business act or practice, including those that violate other laws governing business practices.

91. California Business and Professions Code section 2400, et seq. prohibits any business practice whereby corporations engage in the practice of medicine.

92. California Business and Professions Code section 2000, et seq., prohibits non-physicians from exercising control or discretion over medical practice.

93. Medical decisions regarding appropriate courses of treatment, including continuation and/or cessation of IDPN and IPN, are reserved for patients and their doctors and are properly addressed in the context of the doctor-patient relationship.

94. DaVita has implemented a corporate policy that automatically imposes additional, heightened requirements – beyond even what a licensed physician or even an insurer would require – and an onerous internal approval and appeal process in order for a patient to obtain or continue receiving IDPN or IPN.

95. On information and belief, DaVita's corporate policy has prevented and/or significantly restricted patients from receiving IDPN and IPN, even where a doctor determines, through professional judgment, that it is an appropriate treatment for a dialysis patient.

- 13 -
COMPLAINT

96.     On information and belief, DaVita's corporate policy has prevented and/or significantly restricted physicians' ability to prescribe IDPN and IPN, even where, in the physician's medical judgment, those treatments are appropriate.

97.     Since implementing this policy, DaVita has discontinued IDPN and IPN treatment for over 285 patients served by Pentec.

98.     Not only does DaVita's conduct violate Business and Professions Code sections 2000, et seq., and 2400, et seq.—and therefore constitutes an unlawful business practice—it also is an independently unfair business practice under the UCL because it is unethical and reckless, needlessly harms vulnerable patients, and endangers the business viability of pharmacies that provide those patients with life-sustaining treatments.

99.     As a result of DaVita's policy, Pentec has suffered a loss of money or property and suffered injury in that it has experienced lost sales and revenue and incurred unnecessary risk with respect to its obligations to patients.  These injuries are ongoing and increase every day DaVita's new policy is permitted to remain in effect.

## COUNT II

### (Tortious Interference with Contractual Relations)

100.     Pentec incorporates the allegations in paragraphs 1 through 99 above.

101.     Pentec has agreements with health insurance payers that facilitate reimbursement for the provision of IDPN and IPN to covered patients.

102.     On information and belief, DaVita is aware of Pentec's agreements with health insurance payers.

103.     On information and belief, DaVita intentionally implemented its corporate policy to disrupt and reduce the availability of IDPN and IPN to current patients receiving dialysis at its facilities, thereby frustrating Pentec's ability to obtain reimbursement for the provision of IDPN and IPN to patients whose doctors prescribed or sought to prescribe those treatments.

104.     By forbidding or otherwise discontinuing IDPN and IPN therapies from patients, DaVita's corporate policy has impeded Pentec's ability to obtain reimbursement under its contracts with health insurance payers.

- 14 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

105. As a result of DaVita's actions, Pentec has lost sales and incurred unnecessary risk with respect to its obligations to patients.

### COUNT III

**(Tortious Interference with Prospective Economic Advantage)**

106. Pentec incorporates the allegations in paragraphs 1 through 105 above.

107. Pentec has agreements with health insurance payers that facilitate reimbursement for the provision of IDPN and IPN to covered patients.

108. On information and belief, DaVita is aware of Pentec's agreements with health insurance payers.

109. On information and belief, DaVita intentionally implemented its corporate policy to disrupt and reduce the availability of IDPN and IPN to prospective patients that may receive dialysis at its facilities, thereby frustrating Pentec's ability to obtain reimbursement for the provision of IDPN and IPN to patients whose doctors, but for DaVita's policy, would have prescribed or sought to prescribe those treatments.

110. DaVita's intentional implementation of its corporate policy is independently wrongful because it violates California's prohibition on the corporate practice of medicine and is unauthorized.

111. Pentec's ability to obtain reimbursement under its contracts with health insurance payers has been significantly disrupted by DaVita's actions.

112. As a result of DaVita's actions, Pentec has lost sales and incurred unnecessary risk with respect to its obligations to patients.

## VII.　PRAYER FOR RELIEF

113. To remedy these legal violations and injuries, Pentec respectfully requests that the Court:

      a. Adjudge and decree that DaVita has engaged in the corporate practice of medicine that is prohibited by Business and Professions Code sections 2000, *et seq.*, and/or 2400, *et seq.*, and by doing so, has violated the UCL, Business and Professions Code section 17200, *et seq.*;

- 15 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

b.  Adjudge and decree that DaVita's conduct constitutes an unfair business practice under the UCL, Business and Professions Code section 17200, *et seq.*;

c.  Adjudge and decree that DaVita has tortiously interfered with Pentec's contracts with health insurers by impeding Pentec's ability to obtain reimbursements for treatment provided to patients;

d.  Adjudge and decree that DaVita has tortiously interfered with Pentec's prospective economic advantage to obtain reimbursements through health insurers for patients that, but for DaVita's policy, would have been prescribed IDPN or IPN;

e.  Enjoin DaVita from continuing to implement any policy that has the effect of restricting or preventing the provision of IDPN or IPN to patients receiving dialysis through DaVita;

f.  Award Pentec restitution and damages, including but not limited to economic, non-economic, and punitive damages, as well as an amount equal to its costs, and prejudgment interest;

g.  Grant any other preliminary or permanent relief necessary and appropriate to maintain and restore the status quo with respect to the provision of IDPN and IPN to patients receiving dialysis through DaVita and to those patients' ability to obtain those treatments; and

h.  Grant any additional relief the Court finds just and proper.

## VIII.   JURY DEMAND

114.   Pursuant to Federal Rule of Civil Procedure 38, Pentec demands a trial by jury of all issues so triable in this case.

//

//

//

//

//

//

- 16 -

DATED:  May 1, 2026

**BAKER & HOSTETLER LLP**

/s/ *Victoria L. Weatherford*
VICTORIA L. WEATHERFORD
MATT SCHOCK (PRO HAC VICE
FORTHCOMING)

*Attorneys for Plaintiff*
*PENTEC HEALTH, INC.*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 17 -
COMPLAINT